# EXHIBIT 1

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   _____

 5                                    Case No. 2:24-cv-0896
                                               9-GW-BFM
 6   EMMETT ENRIQUES, individually and
     on behalf of all other situated,
 7

 8                     Plaintiffs,

 9     vs.

10   ONLY WHAT YOU NEED, INC., a
     Delaware Corporation; THE SIMPLE
11   GOOD FOODS COMPANY, a Delaware
     Corporation; AND DOES 1 THROUGH 70,
12   INCLUSIVE,

13                     Defendants.

14   _____

15           CONFIDENTIAL - ATTORNEYS' EYES ONLY

16              VIDEOTAPED DEPOSITION OF

17                   EMMETT ENRIQUES

18              LOS ANGELES, CALIFORNIA

19            TUESDAY, JANUARY 28, 2025

20

21

22   REPORTED BY:
     RONNY ZAVOSKY
23   CSR NO. 12359
     JOB NO. 1392594
24

25
```

```
 1         The deposition of EMMETT ENRIQUES was taken on
 2   behalf of the Defendants at 515 South Flower Street,
 3   18th Floor, Los Angeles, California, commencing at
 4   9:49 A.M. on Tuesday, January 28th, 2025, before
 5   Ronny Zavosky, CSR No. 12359.
 6
 7
 8
 9              A P P E A R A N C E S
10
11   FOR THE PLAINTIFF:
12
13   REESE, LLP
14         BY:  GEORGE V. GRANADE II, ESQ.
15         8484 Wilshire Boulevard, Suite 515
16         Beverly Hills, California  90211
17         (310) 393-0070
18         ggranade@reesellp.com
19
20
21
22
23
24
25
```

```
 1   A P P E A R A N C E S (Continued):

 2

 3   FOR THE DEFENDANTS:

 4

 5   BRAUNHAGEY & BORDEN LLP

 6            BY:  David H. KWASNIEWSKI, ESQ.

 7            747 Front Street, 4th Floor

 8            San Francisco, California  94111

 9            (415) 599-0210

10            kwasniewski@braunhagey.com

11

12

13

14   ALSO PRESENT:

15

16   STEVE PETERSEN, VIDEOGRAPHER

17

18

19

20

21

22

23

24

25
```

```
10:40:37   1    March of 2024?
10:40:39   2              MR. GRANADE:  Objection.
10:40:41   3              THE WITNESS:  Don't -- don't recall.  Yes.
10:40:43   4    Don't recall.
10:41:10   5    BY MR. KWASNIEWSKI:
10:41:10   6         Q    You said you reviewed the complaint before
10:41:13   7    today's deposition.
10:41:14   8              Did you also review it before it was filed?
10:41:19   9         A    No.  Not that I recall.  No.
10:41:27  10         Q    So the first time you saw it was when?
10:41:32  11         A    First time I read it?  Maybe a month or two
10:41:37  12    ago.
10:41:50  13         Q    Did you agree with what was stated in the
10:41:53  14    complaint when you read it?
10:41:54  15         A    Yes.
10:42:55  16         Q    The test results that are referenced in the
10:42:57  17    complaint, do you remember when they were performed?
10:43:02  18         A    I have a general idea that they were performed
10:43:06  19    throughout a larger time frame -- time range of -- I
10:43:11  20    would say, to the best of my knowledge, last year -- the
10:43:15  21    year prior.  And the year prior.  Let me just add that.
10:43:34  22         Q    Do you know if any test results were performed
10:43:37  23    on products purchased between -- OWYN shakes purchased
10:43:40  24    between February and March of 2024?
10:43:42  25              MR. GRANADE:  Object to the form of the
```

```
10:43:43   1    question.
10:43:44   2              THE WITNESS:  Don't recall.
10:43:46   3    BY MR. KWASNIEWSKI:
10:43:47   4         Q    Do you know if any of the products tested were
10:43:49   5    purchased at Target or Whole Foods in West Hollywood,
10:43:54   6    California?
10:43:57   7         A    Don't recall.
10:44:27   8         Q    But you would agree with the allegation in
10:44:30   9    paragraph 20 of the complaint that testing and analysis
10:44:34  10    revealed that the products, one, contained more net
10:44:37  11    carbohydrates than advertised contradicting the zero net
10:44:42  12    carbs claim; two, included hidden sugars or ingredients
10:44:46  13    that metabolizes sugar rendering the zero sugar claim
10:44:50  14    false; and, three, was not suitable for a ketogenic diet
10:44:54  15    due to its actual carbohydrate content making the keto
10:44:58  16    friendly label misleading.
10:44:59  17              You agree with that allegation; right?
10:45:05  18         A    Yes.
10:45:05  19         Q    You would also agree with the allegation that
10:45:08  20    OWYN products contained hidden dietary fiber that
10:45:12  21    rendered the carbohydrate claim false; right?
10:45:14  22         A    Yes.
10:45:20  23         Q    In the complaint at paragraph 23, it says that
10:45:39  24    "Between May 23rd, 2024, and July 3rd, 2024, Simply
10:45:45  25    Good Foods Company completed its acquisition of Only
```

```
10:45:48   1    What You Need Inc."
10:45:51   2            Do you have any reason to doubt the truth of
10:45:53   3    that allegation?
10:45:54   4        A   No.
10:46:03   5        Q   So Simply Good Foods, according to your own
10:46:07   6    complaint, didn't acquire OWYN until at least May of
10:46:11   7    2024; right?
10:46:15   8        A   I have not much knowledge in the terms of
10:46:16   9    acquisition of the parent companies.
10:46:20  10        Q   You would agree with me, though, that if
10:46:22  11    Simply Good Foods Company didn't own or control OWYN
10:46:27  12    during the period of time in which you purchased the
10:46:29  13    shakes, then you would have not been injured by Simply
10:46:32  14    Good Foods Company; right?
10:46:34  15            MR. GRANADE:  Objection.
10:46:38  16            THE WITNESS:  I mean, the type of -- the
10:46:40  17    hypothetical question, would I be injured from drinking
10:46:43  18    the protein shake?  Yes, I would.  Depending on not --
10:46:47  19    whether or not who owns what company, I can't -- I can't
10:46:50  20    give you a straightforward answer to that.
10:46:52  21    BY MR. KWASNIEWSKI:
10:46:53  22        Q   Well, Simply Good Foods Company didn't have
10:46:55  23    anything to do with the advertising or formulation of
10:46:58  24    OWYN protein shake in February and March of 2024 because
10:47:02  25    it didn't acquire OWYN until several months later.  Then
```

EMMETT ENRIQUES - CONFIDENTIAL   JOB NO. 1392594
JANUARY 28, 2025            ATTORNEYS' EYES ONLY

```
10:47:06   1    what specifically could Simply Foods -- Simply Good
10:47:12   2    Foods Company have done to cause you any harm?
10:47:16   3            MR. GRANADE:  Objection.
10:47:17   4            THE WITNESS:  Did they keep selling the
10:47:18   5    product that they knew was mislabeled.  That would be my
10:47:22   6    first question to ask.
10:47:24   7    BY MR. KWASNIEWSKI:
10:47:27   8        Q   Well, you stopped buying the product in March
10:47:28   9    of 2024; right?
10:47:30  10        A   Correct.
10:47:32  11        Q   So if Simply Good Foods kept selling the
10:47:36  12    product after you stopped purchasing it, that didn't
10:47:39  13    cause you any injury; right?
10:47:41  14            MR. GRANADE:  Objection.
10:47:45  15            THE WITNESS:  Personal injury?
10:47:47  16    Hypothetically, no.
10:47:49  17    BY MR. KWASNIEWSKI:
10:48:37  18        Q   Prior to filing this lawsuit, did you make any
10:48:40  19    attempt to reach out to OWYN and ask for a refund or
10:48:43  20    raise these issues?
10:48:44  21        A   Personally, no.
10:49:04  22        Q   You have a brand called "Chappie"; right?
10:49:06  23        A   No.  Chaddy.
10:49:07  24        Q   Chaddy.  I'm sorry.
10:49:09  25            Have your customers ever made any complaints
```

```
10:50:27   1    arose would be.
10:50:46   2        Q    Do you think, in general, that there are too
10:50:47   3    many lawsuits?
10:50:49   4        A    I don't have an opinion.
10:51:12   5             MR. KWASNIEWSKI:  I'll show you what we'll
10:51:13   6    mark for identification as Exhibit 2.
10:51:51   7             (Exhibit 2 was marked for identification.)
10:51:53   8    BY MR. KWASNIEWSKI:
10:51:53   9        Q    This is a Chaddy lip plumper that your company
10:51:59  10    sells; right?
10:52:00  11        A    Uh-huh.
10:52:10  12        Q    And if you turn to the next page it says, in
10:52:13  13    the instructions, "Apply throughout the day or as needed
10:52:17  14    for plump-hydrated lips"; right?
10:52:19  15        A    Uh-huh.
10:52:24  16        Q    The active ingredient here is capsaicin
10:52:28  17    extract; right?
10:52:29  18        A    Correct.
10:52:30  19        Q    And that makes your lips bigger because it
10:52:33  20    irritates them; right?
10:52:37  21        A    That's an oversized -- sorry -- an over --
10:52:40  22    oversimplification of it, but in terms of the active
10:52:48  23    ingredient, that is technically how it works.  Yes.
10:52:53  24        Q    All right.  So it's not true, like it says
10:53:15  25    here, that "It plumps your lips."  It just makes them
```

```
10:53:18   1   red and inflamed; right?
10:53:20   2       A    I mean, like I said earlier, that's
10:53:23   3   hypothetical on what your definition of "plump" is.
10:53:27   4   It's not the only ingredient that plumps your lips.
10:53:30   5   "Plumps" is a very broad definition.  We have other
10:53:32   6   ingredients in there like hyaluronic acid that keep your
10:53:36   7   lips moist and give your lips over time the -- I don't
10:53:41   8   want to say vitamins -- the nutrients that it needs to
10:53:45   9   stay big over time.  So there's not just the active
10:53:47  10   ingredient.
10:53:47  11            And like I said earlier, it depends on your
10:53:50  12   definition of "plump."  We go by the same definition as
10:53:53  13   every other plumper out that do the same thing.
10:53:58  14            MR. KWASNIEWSKI:  I'm going to show you what
10:53:59  15   we'll mark for identification as Exhibit 3.
10:54:22  16            (Exhibit 3 was marked for identification.)
10:54:22  17   BY MR. KWASNIEWSKI:
10:54:25  18       Q    This is a printout from your -- from the
10:54:27  19   Chaddy website.  It is the product page for the Chaddy
10:54:32  20   tanning water duo pack.
10:54:34  21            Do you see that?
10:54:35  22       A    Uh-huh.
10:54:42  23       Q    It says here on the first page, the first
10:54:44  24   sentence "Made for all skin tones.  Our gentler
10:54:48  25   beginner-friendly formula uses plant-based sugarcane
```

| | | |
|---|---|---|
| 10:54:53 | 1 | beet and your skin's natural amino acids to create a |
| 10:54:56 | 2 | warm healthy-looking tan within 12 hours." |
| 10:54:59 | 3 | Did I read that correctly? |
| 10:55:01 | 4 | A    Yes. |
| 10:55:01 | 5 | Q    And there's an asterisk after that. |
| 10:55:07 | 6 | What does that asterisk link to? |
| 10:55:09 | 7 | A    I'm assuming we put the asterisk in there |
| 10:55:12 | 8 | because it can be plus or minus 12 hours. |
| 10:55:19 | 9 | Q    Does it say that anywhere on this page? |
| 10:55:21 | 10 | A    In front of me?  No. |
| 10:55:39 | 11 | Q    Anywhere in the exhibit? |
| 10:55:49 | 12 | A    What exactly are you asking? |
| 10:55:50 | 13 | Q    Does it say anywhere in the document -- in the |
| 10:55:53 | 14 | exhibit that it's plus or minus 12 hours for the tan to |
| 10:55:56 | 15 | occur? |
| 10:56:04 | 16 | A    In this exhibit?  No, it doesn't say that. |
| 10:56:09 | 17 | Q    Do you know if it says that anywhere on your |
| 10:56:11 | 18 | website? |
| 10:56:12 | 19 | A    Well, we're saying allow the tan to develop |
| 10:56:15 | 20 | for up to 12 hours.  So we're just saying let them |
| 10:56:18 | 21 | develop it for up to 12 hours. |
| 10:56:20 | 22 | Q    But you said plus or minus, so it could take |
| 10:56:22 | 23 | longer than 12 hours. |
| 10:56:23 | 24 | A    It could.  Everybody is different. |
| 10:56:25 | 25 | Q    You don't explain that in this -- on this -- |

```
11:22:23   1             Did you review any of the letters that your
11:22:25   2   lawyers sent prior to filing the complaint to OWYN?
11:22:30   3        A    I do remember reading them, yes.
11:22:32   4        Q    When did you read them?
11:22:35   5        A    Around the same time that I read the
11:22:38   6   complaint.
11:22:42   7        Q    And just so the record is clear, around what
11:22:44   8   time frame was that?
11:22:45   9        A    I would say one or two months ago; however,
11:22:49  10   that's just reading them myself.  I had prior knowledge
11:22:52  11   of them since I've been in contact with my lawyers from
11:22:56  12   the past year.  So I did have an understanding of what
11:22:58  13   it was.
11:23:49  14        Q    So the complaint, as you may recall, discusses
11:23:52  15   four flavors of shakes.  The chocolate, vanilla --
11:24:00  16        A    No Nut Peanut Butter.
11:24:01  17        Q    Right.
11:24:01  18        A    Sea Salt, Caramel.
11:24:03  19        Q    Great.  The complaint says in paragraph 5 that
11:24:09  20   you purchased the shakes at retail locations in
11:24:13  21   California, including Los Angeles County, but you never
11:24:16  22   purchased the No Nut Butter Cup; right?
11:24:19  23        A    No.
11:24:19  24        Q    And you never purchased the Sea Salt Caramel;
11:24:22  25   right?
```

```
11:24:23  1            A    No.
11:24:24  2            Q    So, in fact, that allegation in the complaint
11:24:25  3    that you purchased all those different flavors, that's
11:24:27  4    not true, is it?
11:24:28  5                 MR. GRANADE:  Objection.
11:24:30  6                 THE WITNESS:  I just purchased two of the
11:24:32  7    flavors.
11:24:32  8    BY MR. KWASNIEWSKI:
11:25:11  9            Q    Earlier we talked about the types of relief
11:25:13  10   that you were seeking in this lawsuit.  We discussed
11:25:15  11   monetary relief.  You also mentioned injunctive relief.
11:25:21  12                What specific injunctive relief are you
11:25:25  13   seeking with this lawsuit?
11:25:26  14                MR. GRANADE:  Objection.
11:25:28  15                You may answer.
11:25:30  16                THE WITNESS:  Let me first clarify that I am
11:25:32  17   in no way an expert in law, in business, and labeling
11:25:38  18   products.  However, when I say injunctive relief, my --
11:25:45  19   the main meaning behind that, it means to be -- the
11:25:49  20   labels re- -- how do I put this?  I'd like to see the
11:25:55  21   labels not mislabeled and to be changed to reflect what
11:25:58  22   is actually in the product.
11:25:59  23   BY MR. KWASNIEWSKI:
11:26:12  24           Q    So just so that I understand, you are not
11:26:19  25   asking for the formula of the product to be changed?
```

```
11:34:51   1        Q    What if some batches of OWYN's shakes were --
11:34:56   2   had all the protein advertised and just some batches
11:34:59   3   didn't?  You would agree with me if that were the case,
11:35:03   4   then people who bought the batches that had all the
11:35:06   5   protein wouldn't have suffered an injury; right?
11:35:09   6             MR. GRANADE:  Objection.
11:35:12   7             THE WITNESS:  I would say -- so you are saying
11:35:16   8   if they had drinking -- if they had "drinken" the
11:35:19   9   product that was properly labeled -- that was batched
11:35:26  10   properly and labeled properly, that they wouldn't have
11:35:28  11   suffered injury, I would say yes.
11:35:30  12   BY MR. KWASNIEWSKI:
11:35:41  13        Q    Do you know which specific batches of OWYN's
11:35:43  14   shakes were not properly labeled?
11:35:47  15        A    Personally?  No.
11:36:15  16        Q    Switching gears a little bit.  I wanted to
11:36:17  17   talk to you about how you came to retain your lawyers in
11:36:22  18   this case.
11:36:22  19             How did you come to meet them?
11:36:25  20        A    I first met Alec when he was in law school
11:36:31  21   years ago.  And I only met George recently.  Within this
11:36:39  22   last month or two.
11:36:46  23        Q    How did you come to hire Alec in connection
11:36:48  24   with this case?
11:36:49  25        A    Alec actually worked for -- I wouldn't say
```

```
11:36:53   1    worked for me.  He was an independent contractor for me
11:36:56   2    in the past, so I had a good understanding of what he
11:36:59   3    did.  And he -- when he left working with me, I --
11:37:04   4    that's when I had a good understanding of what he did,
11:37:06   5    so that's how I kind of came into it and understood
11:37:10   6    that.
11:37:22   7         Q    You said earlier that you personally didn't
11:37:24   8    test any of OWYN's shakes.
11:37:26   9              Do you know who did?
11:37:33  10         A    I would make the assumption -- no.  As in who
11:37:39  11    sent it in?  No.
11:37:50  12         Q    Prior to you hiring Alec to represent you in
11:37:54  13    this case, did Alec approach you with the test results?
11:37:58  14         A    No.
11:37:59  15         Q    How did you hear about the test results?
11:38:02  16         A    I heard about the test results through Alec
11:38:05  17    because I was at his place and saw that he had the
11:38:11  18    protein shakes at his place, and me knowing, through
11:38:14  19    prior work through Alec, what he does for a career,
11:38:18  20    living, had asked him about it because I was drinking
11:38:22  21    the protein shakes around the same time.
11:38:26  22         Q    And at that time, was Alec representing you as
11:38:29  23    an attorney?
11:38:29  24         A    No.
11:38:33  25         Q    So what specifically did you ask Alec about
```

```
11:38:35   1    the protein shakes?
11:38:37   2         A    I asked him -- I asked him whether or not
11:38:39   3    the -- I asked -- first, I asked his thoughts and I
11:38:43   4    can't recall the exact conversation.  But I asked what
11:38:46   5    his relationship was with the protein shakes and what
11:38:48   6    was going on, and that's when I saw the nutrition.
11:38:55   7         Q    When you say "nutrition," you are talking
11:38:56   8    about the test results?
11:38:57   9         A    Yes.
11:39:02  10         Q    After you saw the test results, what did you
11:39:04  11    discuss?
11:39:07  12              MR. GRANADE:  And I just want to caution my
11:39:09  13    client, at some point my understanding is the
11:39:10  14    attorney-client privilege does attach here because, you
11:39:14  15    know, they started talking about Emmett wanting to
11:39:18  16    retain Alec.  So I take it that you are not asking about
11:39:22  17    those conversations once that had occurred.
11:39:24  18    BY MR. KWASNIEWSKI:
11:39:24  19         Q    Yeah.  I'm only asking about your
11:39:27  20    conversations prior to retaining Alec as your lawyer.
11:39:34  21    So you saw the test results.
11:39:35  22              Did you have any other conversations with Alec
11:39:37  23    before you decided to hire him as your lawyer?
11:39:40  24         A    I would -- I would say no.  I -- I mean, I
11:39:43  25    took interest for personal reasons.  I've taken a lot
```

```
11:39:47   1    law classes before.  You know.  It's interesting to me.
11:39:51   2             Labeling, you know, like it's more of a
11:39:54   3    personal thing.  So after this -- that conversation that
11:39:58   4    was it.
11:40:01   5         Q    And you said you've taken on classes before?
11:40:05   6         A    I've taken law classes before.
11:40:07   7         Q    You've taken law classes.
11:40:09   8              Have you ever served as a plaintiff in another
11:40:11   9    lawsuit?
11:40:13  10         A    No.
11:40:13  11              THE VIDEOGRAPHER:  It's still attached.
11:40:16  12              THE WITNESS:  Oh, okay.
11:40:18  13    BY MR. KWASNIEWSKI:
11:40:18  14         Q    Have you ever been a party to a -- a prior --
11:40:20  15    a lawsuit before?
11:40:21  16         A    No.
11:40:37  17         Q    We've touched on this briefly, but you
11:40:40  18    understand that in this case you are representing a
11:40:42  19    class of consumers across the state and the entire
11:40:46  20    country; right?
11:40:47  21         A    Correct.
11:40:48  22         Q    And you understand that as a class
11:40:49  23    representative, you have duties to the other members of
11:40:52  24    the class that aren't present here today; right?
11:40:55  25         A    Correct.
```

| Time | # | Text |
|---|---|---|
| 11:43:38 | 1 | other class members to not receive any money if you and |
| 11:43:41 | 2 | your lawyers receive money; right? |
| 11:43:43 | 3 | A   I -- I think that the other class members |
| 11:43:45 | 4 | should receive money.  Yes. |
| 11:44:40 | 5 | MR. KWASNIEWSKI:  I'm going to show you what |
| 11:44:41 | 6 | we'll mark for identification is Exhibit 4. |
| 11:44:48 | 7 | (Exhibit 4 was marked for identification.) |
| 11:45:29 | 8 | BY MR. KWASNIEWSKI: |
| 11:45:30 | 9 | Q   Does Exhibit 4 look like the label on the |
| 11:45:32 | 10 | chocolate protein shake that you purchased? |
| 11:45:35 | 11 | A   No. |
| 11:45:36 | 12 | Q   What's different? |
| 11:45:38 | 13 | A   Serving side -- size; food ounces; type of |
| 11:45:42 | 14 | packaging; shape of packaging.  That's as far as I can |
| 11:45:50 | 15 | go. |
| 11:46:15 | 16 | Q   So you did not purchase the Elite Pro |
| 11:46:17 | 17 | Chocolate in the 355-milliliter configuration? |
| 11:46:20 | 18 | A   I believe -- no.  I did not. |
| 11:46:23 | 19 | Q   Which OWYN chocolate shake did you purchase? |
| 11:46:28 | 20 | A   The -- it's either 335 or 330.  Off the top of |
| 11:46:33 | 21 | my head, I can't remember, but it's not -- it's not this |
| 11:46:36 | 22 | bottle shape. |
| 11:47:03 | 23 | Q   And same question for the vanilla shake. |
| 11:47:05 | 24 | Did you buy the 355-milliliter or 335? |
| 11:47:09 | 25 | A   Same as the chocolate. |

EMMETT ENRIQUES - CONFIDENTIAL                              JOB NO. 1392594
JANUARY 28, 2025              ATTORNEYS' EYES ONLY

```
 1              I, RONNY ZAVOSKY, CSR No. 12359, certify that
 2   the foregoing proceedings were taken before me at the
 3   time and place therein set forth, at which time the
 4   witness was duly sworn and that the transcript is the
 5   true record of the testimony so given;
 6
 7            Witness review, correction and signature
 8       (X) shall be per venue code    ( ) was requested
 9       ( ) was not requested          ( ) was waived
10       ( ) not handled by the deposition officer due to
11           party stipulation
12
13            The dismantling, unsealing, or unbinding of
14   the original transcript will render the reporter's
15   certificate null and void.
16            I further certify that I am not financially
17   interested in the action, and I am not a relative or
18   employee of any attorney of the parties, nor of any of
19   the parties.
20            Dated this 7th day of February, 2025.
21
22
23                                _____
                                  RONNY ZAVOSKY, CSR NO. 12359
24                                CERTIFIED SHORTHAND REPORTER
25
```